2025 IL App (4th) 250543-U

NOS. 4-25-0543, 4-25-0544, 4-25-0545 cons.

**NOTICE**
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

**FILED**
October 15, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Be. W, Bry. W., and Bra. W., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
| Petitioner-Appellee, | ) | Nos. 20JA446 |
| v. | ) | 20JA447 |
| Bryan W., | ) | 20JA448 |
| Respondent-Appellant). | ) | |
| | ) | Honorable |
| | ) | David A. Brown, |
| | ) | Judge Presiding |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Harris and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court granted appellate counsel's motion to withdraw and affirmed, concluding that no issue of arguable merit could be raised on appeal.

¶ 2    In May 2024, the State filed a petition to terminate the parental rights of respondent Bryan W. as to his minor sons, Be. W. (born July 21, 2020), Bry. W. (born December 14, 2018), and Bra. W. (born January 21, 2015). (The minors' mother, Brandy R., is not a party to this appeal.) In May 2025, the trial court terminated respondent's parental rights and changed the children's permanency goal to adoption.

¶ 3    Respondent filed a notice of appeal, and the trial court appointed counsel to represent him. Appointed counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738 (1967), arguing that respondent's appeal presents no potentially meritorious issues for

review. Respondent was notified of his opportunity to respond to the motion. Respondent did not file a response. We grant the motion to withdraw and affirm the court's judgment.

¶ 4                                    I. BACKGROUND

¶ 5        In September 2020, the State filed a petition to adjudicate Be. W. neglected under section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2020)). The State alleged Be. W.'s environment was injurious to his welfare because (1) when he was born, a blood sample taken from his umbilical cord tested positive for methamphetamine, a controlled substance (see 720 ILCS 570/206(d)(2) (West 2020)), (count I) and (2) respondent had substance abuse issues (count II). The State also petitioned to adjudicate Bry. W. and Bra W. neglected based solely on count II. Following a shelter care hearing, the Illinois Department of Children and Family Services (DCFS) was given temporary custody of the three children.

¶ 6        From September 2020 to May 2024, respondent failed to make reasonable progress toward reunification. Although he was compliant with DCFS's recommendations in the beginning of this period, that changed when respondent, among other things, was ticketed for driving while under the influence of alcohol, missed random drug testing, tested positive for illegal drug use, and failed to communicate with DCFS.

¶ 7        As a result, the children were adjudicated neglected in February 2021. The State subsequently petitioned to terminate respondent's parental rights, alleging that respondent failed to make reasonable progress toward reunification from July 7, 2023, to April 7, 2024 (750 ILCS 50/1(D)(m)(ii) (West 2024)).

¶ 8        Permanency reports filed in the trial court revealed respondent was ordered to complete four drug tests per month from July 7, 2023, to April 7, 2024. From April 2023 to

December 2024, respondent tested positive for tetrahydrocannabinol (THC) and/or methamphetamine 10 times, failed to appear 36 times, and was denied testing 3 times. Before July 7, 2023, respondent tested positive for illegal drug use twice. After April 7, 2024, respondent tested positive for illegal drug use 5 times, failed to appear 24 times, and was denied testing 3 times. During the relevant nine-month period, respondent tested positive for illegal drug use 3 times and failed to appear 12 times.

¶ 9        A report prepared by Trillium Place, an addiction recovery center, revealed that prior to September 2023, respondent used methamphetamine two to three times per week. Respondent reported that he relapsed after September 2023 and started using methamphetamine again because of increased stress and mild depression.

¶ 10                            A. Fitness Hearing

¶ 11                              1. *Evidence*

¶ 12        The fitness hearing took place in May 2025. At the hearing, the trial court, without objection, took judicial notice of "the auxillary cases[,] including prior orders, pleadings, and motions."

¶ 13        Mindy Fischer, the DCFS caseworker, testified that from July 7, 2023, to April 7, 2024, respondent was required to (1) cooperate with DCFS and all service providers, (2) attend domestic violence classes, (3) undergo a substance abuse assessment, (4) follow all recommendations of the substance abuse assessment, (5) complete four random drug tests per month, and (5) visit the children regularly. Fischer stated that respondent failed to complete domestic violence classes. However, she explained that that could have been attributable to the fact the referral did not go through. Fischer also asserted respondent failed to complete a substance abuse assessment and tested positive for THC and methamphetamine. Because respondent's job

made it difficult to complete drug tests, he was afforded the opportunity to submit hair follicles for testing, which did not require respondent to go to a specified location.

¶ 14 Further, although respondent visited the children consistently, had stable employment, and lived in a suitable home, Fischer was skeptical that he would be able to care for his sons, as he was frequently out of town for work. Respondent told Fischer he had family who would help, but she was never able to meet them. Respondent also advised Fischer that if the children were returned to his care, he would quit his job and find full-time employment in Decatur, Illinois. However, as Decatur was a distance away from his home in Peoria, Illinois, Fischer asserted respondent would still need help raising the children.

¶ 15 2. *The Trial Court's Ruling*

¶ 16 The trial court found respondent unfit. In so finding, the court did not give any weight to respondent's failure to attend domestic violence classes. However, the court did consider that, during the relevant nine-month period, respondent tested positive for methamphetamine and THC, confirmed he had a relapse, and admitted to using drugs two to three times per week. Moreover, the court observed respondent was referred to drug treatment, which he failed to complete.

¶ 17 B. Best Interest Hearing

¶ 18 The best interest hearing was held immediately after the fitness hearing. Before hearing testimony, the trial court observed it "ha[d] received and reviewed some best interest reports prepared or filed by [DCFS]."

¶ 19 1. *Evidence Concerning Bra. W.'s Best Interest*

¶ 20 Bra. W. enjoyed spending time with respondent, loved him, and pleaded with him at one point to stop using drugs and do what "they" wanted. Bra. W., who was in residential

treatment, was scheduled to be released from treatment in one to three months. He told Fischer that, when he was released, he would like to return to the care of his foster mother, Susan W. Susan visited Bra. W. numerous times while he had been in treatment, lived in an appropriate home, and had a room in her house for Bra. W. When Bra. W. spoke about Susan's home, he referred to it as his own.

¶ 21　　　　Susan testified she has three other foster children living in her house, one of whom was around Bra. W.'s age. The children, who have had contact with Bra. W., acted like siblings. Susan stated Bra. W. was on his school's football team and enjoyed extended family gatherings. Susan had worked with Bra. W. on his anger issues, helping him to calm down and remove himself from upsetting situations. She also facilitated Bra. W. going to mental health counseling. When asked, Susan asserted she "[m]ost definitely" would take Bra. W. in, and she and her husband wanted to adopt him.

¶ 22　　　　　　　　2. *Evidence Concerning Bry. W.'s Best Interest*

¶ 23　　　　Fischer testified that Bry. W. had been in his current foster home for three months. The foster home had an appropriate place for Bry. W. to sleep and provided him with adequate food and clothing. Bry. W. had become close to his foster parents, especially his foster mother, Jennifer H. After being placed in the foster home, Bry. W.'s behavioral problems improved, which included his behavior at school. To help address Bry. W.'s behavioral problems, he was removed from visitation with respondent, as he suffered severe behavioral issues after visiting him and Brandy R.

¶ 24　　　　Jennifer testified that three children lived in her home. One child, a five-year-old girl, was her foster daughter, and the other child was her stepson, who spent half of his time in her home. Jennifer stated the children acted like siblings, with Bry. W. choosing to share a room with

her stepson. Although Bry. W. acted out at first when he moved into the home, that "[t]remendously" improved. He learned to calm himself at home and in school, followed daily routines, and complied with the rules of the house. Although Bry. W. initially felt insecure when he first moved in, fearing he would be sent to another home if he misbehaved, those fears had been allayed. Bry. W. played T-ball, wanted to play football on a junior team that Jennifer's husband coached, built community ties, enjoyed extended family gatherings, and had adjusted "[v]ery well" to living in the family's house. Henry testified she and her husband, with whom Bry. W. was also close, wanted to adopt Bry. W. and would "[a]bsolutely" help him maintain ties with his biological brothers.

¶ 25                    3. *Evidence Concerning Be. W.'s Best Interest*

¶ 26          Fischer stated Be. W. was a kindergartner and had been in his current foster home for eight months. He was not very verbal, but his foster family was working on improving his verbal skills.

¶ 27          Chad B., Be. W.'s foster father, testified Be. W. was the only child in their home. Be. W. called his foster parents "mom and dad," was used to his foster parents' rules and routines, and was doing "very well in school." Be. W. received therapy at school, and his speech therapy would continue over the summer, with Chad and his wife working with Be. W. on his speech at home. Be. W. very much enjoyed activities with the extended family and talked about his biological brothers on occasion. Chad asserted he and his wife "100 percent" wished to adopt Be. W. and would "[a]bsolutely" help him maintain a bond with his biological brothers.

¶ 28                    4. *Respondent's Testimony*

¶ 29          Respondent testified that although he used to drive to Tennessee for work, he had started working within driving distance of Peoria within the last three months. At his new job, he

made less money and worked 8 to 10 hours per day. Respondent recognized these hours would interfere with him taking care of the children daily, but he indicated his brother and sister would be able to help him. Respondent explained that his siblings could work it out so that one of them would be at home with the children when he was unable to care for them. Respondent admitted he had not told Fischer about his new employment, but he could do so. Respondent stated his current employment made it difficult for him to complete drug tests, but it was not as difficult as it was when he was working at his old job. He asserted that sometimes when he went to his drug tests, he was denied services because he was not on the schedule. (Fischer, when recalled, testified respondent only contacted her once about being denied services, and she admitted his omission from the schedule was most likely her fault.) Respondent stated he was not currently using any illegal substances, had not done so within the last year, and was not engaged in substance abuse treatment.

¶ 30                                   5. *The Trial Court's Ruling*

¶ 31          After considering the best interest factors, the trial court terminated respondent's parental rights and changed the permanency goal for the children to adoption. The court observed the children had been removed from their parents' care for 4 ½ years, and, as a result, their identity lay "with the foster care system," which the court noted was terrible for children. In their current placements, the children were starting to form a sense of permanence, belonging, and attachment with stable adults who could be there for them the rest of their lives. The court noted that although respondent attempted to do a couple drug tests within the last few months in an effort to get the children back, that was "pretty late in the game."

¶ 32          As to Bra. W., the trial court found he wanted to reside with Susan when he was released from residential treatment because that was where he felt loved and secure. Although the

other two children were not able to clearly express where they wished to be placed, the court observed they had started to form a sense of security and familiarity with their foster families. Lastly, the court noted all the foster families were able to provide for and were committed to the children.

¶ 33 This timely appeal followed.

¶ 34 II. ANALYSIS

¶ 35 Respondent's appellate counsel moves to withdraw. Counsel supports her motion with a memorandum of law providing a statement of facts, a discussion of potential claims, and arguments as to why those issues lack arguable merit. Notice of counsel's request to withdraw was sent to respondent's last known address. The notice advised respondent he could respond, but no response was filed.

¶ 36 Counsel submits it would be frivolous to argue that the trial court erred in finding (1) respondent unfit and (2) it was in the best interest of the minors to terminate respondent's parental rights. We agree.

¶ 37 Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2024)), the involuntary termination of parental rights is a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2024)). *In re Donald A.G.*, 221 Ill. 2d 234, 244 (2006). If the State proves unfitness, it then must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *In re D.T.*, 212 Ill. 2d 347, 363-66 (2004).

¶ 38 A. Unfitness

¶ 39 Counsel first submits it would be frivolous to argue the trial court erred in finding respondent unfit.

¶ 40    A determination of parental unfitness involves factual findings and credibility determinations the trial court is in the best position to make. See *In re M.I.*, 2016 IL 120232, ¶ 21 ("[T]he trial court's opportunity to view and evaluate the parties *** is superior." (Internal quotation marks omitted.)). A trial court's finding of parental unfitness will not be reversed unless it is against the manifest weight of the evidence. *In re N.G.*, 2018 IL 121939, ¶ 29. A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent. *Id.*

¶ 41    Here, respondent was found unfit under section 1(D)(m)(ii) of the Adoption Act, which provides that a parent may be found unfit for failing "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2024). "Reasonable progress has been defined as demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007). Reasonable progress exists when the trial court

> "can conclude that *** the court, in the *near future*, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 42    We have emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88 (quoting *L.L.S.*, 218 Ill. App. 3d at 461). A trial court may only consider evidence from the relevant time period in determining a parent's fitness based on

reasonable progress. *Reiny S.*, 374 Ill. App. 3d at 1046 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38 (2003)).

¶ 43        In this case, the children were removed from respondent's care because of his substance abuse issues. During the relevant nine-month period, respondent used illegal drugs weekly, did not get treatment for his substance abuse, failed to appear at drug testing, and tested positive for methamphetamine and THC. Although respondent claimed to have rectified his substance abuse problems, nothing in the record substantiates this claim. Based on the evidence, the trial court could not conclude it would, in the near future, be able to order the children returned to respondent's custody because he would have fully complied with directives in place to correct the reason for the removal of the children from his care. Thus, the court's determination respondent was unfit was not against the manifest weight of the evidence.

¶ 44                                B. Best Interest

¶ 45        Counsel next submits it would be frivolous to argue the trial court erred in finding it was in the children's best interest to terminate respondent's parental rights.

¶ 46        After a trial court finds a parent unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *D.T.*, 212 Ill. 2d at 352. "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. The State must prove by a preponderance of the evidence termination of parental rights is in the minor's best interest. *Id.* at 366. In making the best interest determination, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2024)). These factors include:

            "(1) the child's physical safety and welfare; (2) the development of the

child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071(2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

"The court's best interest determination [need not] contain an explicit reference to each of these factors, and a reviewing court need not rely on any basis used by the trial court below in affirming its decision." *In re Tajannah O.*, 2014 IL App (1st) 133119, ¶ 19.

¶ 47       On review, "[w]e will not disturb a court's finding that termination is in the [child's] best interest unless it was against the manifest weight of the evidence." *In re T.A.*, 359 Ill. App. 3d 953, 961 (2005). A best interest determination "is against the manifest weight of the evidence only if the facts clearly demonstrate that the trial court should have reached the opposite result." *Jay H.*, 395 Ill. App. 3d at 1071.

¶ 48       Here, although respondent has steady employment and a home suitable for the children, his living arrangements are not conducive to raising his sons. Respondent is unable to care for the children when they are out of school and he is at work, and he has no definitive plans in place to provide care for them when he is not home. Balanced against that is the fact all three children have strong bonds with their foster parents. The foster parents provide for the children's

physical, emotional, and educational needs; involve them in activities; include them in family gatherings; wish to provide them with permanence by adopting them; and will work toward helping the children maintain contact with each other. The trial court considered the evidence presented at the best interest hearing in relation to the statutory best interest factors and found they weighed in favor of terminating respondent's parental rights. We cannot conclude the evidence in the record clearly demonstrates the court should have reached the opposite result. Accordingly, the court's best interest determination is not against the manifest weight of the evidence.

¶ 49 After examining the record, the motion to withdraw, and the memorandum of law, we agree with counsel that this appeal presents no issue of arguable merit. Accordingly, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 50 III. CONCLUSION

¶ 51 For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 52 Affirmed.